**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **W.G. YATES & SONS** | ) | |
| **CONSTRUCTION COMPANY,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0803-WS-B** |
| | ) | |
| **ZURICH AMERICAN INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

**ORDER**

This non-jury declaratory judgment action comes before the Court on cross-motions for summary judgment (docs. 39, 51) brought by plaintiff, W.G. Yates & Sons Construction Company ("Yates"), and defendant, Zurich American Insurance Company ("Zurich"). Both motions have been extensively briefed and are now ripe for disposition.

**I.     Factual Background.**[1]

    ***A.     The Accident.***

On December 9, 2004, a tragic accident occurred at the construction site of the Caribe Tower III condominium project in Orange Beach, Alabama. A construction worker named Martin Guerrero was working on the job site within the line and scope of his duties when he fell from a concrete wall form, sustaining injuries. At the time of Guerrero's accident, he was employed by nonparty Ceco Concrete Construction, LLC ("Ceco"), the concrete form work subcontractor at the Caribe Tower site. (Battles Dep., at 11, 23, 92; Zurich Exh. 8, at 4.) In this

---

[1]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). For that reason, with respect to each party's respective motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in that party's favor to the extent possible given the near-identity of issues and arguments presented in the cross-motions.

capacity, Ceco was responsible for forming the concrete structure (*e.g.*, pile caps, foundations, decks and walls) of the condominium tower.  (G. Yates Dep., at 10-11.)

On the day in question, Guerrero was assigned to a Ceco crew that was setting walls and decking on the fifth and sixth floors of the tower.  (Battles Dep., at 23-24.)  This process involved building a wall form (usually on site), and moving it via crane to the appropriate location.  (*Id.* at 30, 44.)  The wall form would then be braced to the floor and closed off, after which concrete would be poured into the mold to create the wall.  (*Id.* at 30-33, 72.)  It was Ceco's exclusive responsibility and solely within Ceco's control to erect the wall form, rig the wall form to the crane, direct the crane operator as to the proper placement of the wall form (using control lines or control points provided by the general contractor), and attach braces to the wall form.  (*Id.* at 37-38, 47-49, 59.)  The crane operator who actually moved the wall forms on Ceco's behalf on the day in question was Richard Price, who was not nominally employed by Ceco.  (*Id.* at 64.)  Rather, Price had been hired and was paid by the general contractor, plaintiff Yates.  (G. Yates Dep., at 9.)  The crane that Price was operating on December 9, 2004 was likewise provided by Yates.  (Battles Dep., at 64-65, 76.)

The circumstances that led to the accident were these: Price had moved a wall form to a designated location on the fifth floor at the direction of, and under the exclusive supervision of, Ceco.  (*Id.* at 80-82.)  Guerrero was instructed by Ceco to attach the north side of wall form to a turnbuckle brace.  (*Id.* at 80-83.)  To do so, Guerrero climbed onto the wall form; however, he subsequently fell, hitting his head on a turnbuckle brace.  (*Id.* at 82-83, 88.)  Multiple witness statements collected by Ceco in its investigation of the accident reflect that, as Guerrero was climbing the wall to install the brace, Price (the crane operator) abruptly lifted the wall form and swung it to the right of his own volition, without any direction from Ceco, after which Guerrero was unable to maintain his grasp on the wall form and fell to the ground from a height of at least 8 to 10 feet.  (Zurich Exh. 7.)[2]

---

[2]     This collection of employee statements is the subject of a Motion to Strike (doc. 61) filed by Yates.  According to Yates, these investigative statements should be stricken because they are not in the form of affidavits permitted by Rule 56(e), Fed.R.Civ.P., are unsworn, and constitute inadmissible hearsay.  (Doc. 61, at 1-2.)  This Motion is without merit for four reasons.  First, Zurich does not submit Exhibit 7 as affidavits, but rather as business

### B.    Richard Price.

The key issue in this litigation concerns the status of Price.  The relevant facts are largely undisputed, although the implications of those facts are hotly contested.  As an initial matter, the parties have stipulated that Price "was initially employed by Yates.  He was paid by Yates.  He was listed as an employee on Yates's payroll.  He was a Yates employee on the day of this incident."  (G. Yates Dep., at 19.)  Yates hired Price as a crane operator for the Caribe project on December 6, 2004, just three days prior to the accident.  (Horton Aff. (Yates Exh. F), at 2; Zurich Exh. 9.)  It was Yates's decision whether to employ Price, and whether to continue employing Price, inasmuch as Ceco did not hire him and had no right to fire him.  (Horton Aff., at 2.)  That said, had Ceco objected to Price's performance operating the crane in furtherance of Ceco's concrete formation duties, Yates would have considered relieving him of his duties as crane operator at that location and reassigning him elsewhere.  (*Id.*)[3]  There is no evidence,

---

records compiled and maintained by Ceco in the course of its investigation of the accident; therefore, whether those statements satisfy Rule 56(e)'s requirements is immaterial.  Second, Yates's objection is perplexing given its previous on-the-record stipulation that those documents were in fact "maintained in the ordinary course of business of Ceco Concrete, LLC."  (Battles Dep., at 7, 20.)  Having stipulated that those documents are Ceco business records, Yates cannot legitimately recharacterize them as inadmissible affidavits now.  Third, Yates is trying to have it both ways.  Indeed, Yates relies on those statements (albeit indirectly) in its Motion for Summary Judgment by submitting deposition excerpts in which Ceco's representative was questioned at length about those very same witness statements.  In doing so, Yates would apparently have the Court consider certain passages from those statements that further its purposes (through the intermediary of the Ceco deposition), while discarding the remainder as inadmissible hearsay.  Such selectivity is inappropriate.  Fourth, Yates ignores the well-established principle that even inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1327 n. 2 (S.D. Ala. 2003) ("Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.").  There is no reason to believe (and Yates does not suggest) that Zurich's Exhibit 7 cannot be reduced to admissible form at trial; therefore, it is properly considered on summary judgment.  For all of these reasons, Yates's Motion to Strike is **denied**.

[3]    As Yates's senior project manager, George Yates, put it in his Rule 30(b)(6) deposition, "If Ceco had issues with [Price]'s operation of the crane that would have an impact

however, that Ceco ever objected to Price's work performance at any time prior to the Guerrero accident, and John Horton (Yates's General Superintendent on the Caribe job site) affirmatively averred that Yates received no such complaints by Ceco.  (*Id.* at 2.)

On December 9, 2004, Yates (not Ceco) assigned Price to operate the crane in connection with Ceco's concrete form activities on the job site.  (G. Yates Dep., at 21.)  Price reported to Horton, and it was Horton who scheduled work assignments for Price and all other crane operators.  (*Id.* at 25, 29.)  However, Horton did not direct, control or oversee Price's activities once Price arrived at the crane and began moving wall forms under Ceco's direction.  (Horton Aff., at 3-5.)  In the days following the Guerrero accident, Yates (not Ceco) decided to remove Price from the crane assignment and to suspend Price with pay pending investigation.  (G. Yates Dep., at 35; Zurich Exh. 9.)  A couple of weeks later, Yates (not Ceco) terminated Price's employment.  (G. Yates Dep., at 36.)

Price's relationship with Yates is clouded by the circumstances surrounding his hire and the conditions in which he worked.  It is undisputed that Yates hired Price pursuant to its contractual arrangement with Ceco, which obliged Yates to furnish both a crane and a crane operator for Ceco's use in performing concrete formation work on the Caribe site.  (Battles Dep., at 64-65; Horton Aff., at 2-3; Yates Exh. C, at YATES00037, ¶ 6.)[4]  The subcontract was silent

_____

on who sat in the crane."  (G. Yates Dep., at 27.)  There was some ambiguity in the testimony of Yates representatives as whether an objection by Ceco would necessarily have led to Price's reassignment by Yates, or whether it only <u>might</u> have led to such a result.  (*Compare* G. Yates Dep., at 29 *to* Horton Aff., at 2.)  Yates cannot pick and choose between the statements made by its own Rule 30(b)(6) witness to concoct the summary judgment narrative most favorable to its cause.  *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) ("When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.").  Simply put, Yates is bound on summary judgment by the testimony of its Rule 30(b)(6) witness, even if other Yates witnesses provided testimony more to its liking.

[4]        The precise wording of the subcontract in this regard was that Yates was required to provide "at no cost to Ceco use of hoists including operator at all times and in all areas ... for unloading, hoisting, positioning, and loading Ceco's forming materials."  (Yates Exh. C, at

-4-

as to who would direct the crane operator's work on the job site; however, the record unambiguously confirms that it was Ceco (and not Yates) who decided when and for what tasks the crane and crane operator would be used, and that it was Ceco (and not Yates) who instructed the crane operator what to lift, when to lift it, where to move it, and where and when to set it down. (Horton Aff., at 3; Battles Dep., at 49, 99-107.)  Simply put, "Ceco had the power ... to tell Price or any other crane operator working in [C]eco's scope of work to do whatever Ceco felt needed to be done to get the project done." (G. Yates Dep., at 41.)  It was not Yates's responsibility to flag the crane or otherwise to instruct the crane operator what to do after Ceco employees had rigged a wall form to the crane. (Battles Dep., at 78.)  Yates gave no such instructions and assumed no such responsibility.[5]

Consistent with the foregoing, on December 9, 2004, Price was receiving directions on where to hoist the wall forms by a Ceco employee named Leoncio Garcia, who was responsible for "flagging" the crane (*i.e.*, communicating with Price via hand signals or radio). (Battles Dep., at 75-77, 81-82.)  There is no contest that "Ceco was responsible for directing the movement of the crane with respect to the wall form that was involved in Mr. Guerrero's accident." (*Id.* at 77; *see also* G. Yates Dep., at 19.)  Yates had no involvement in that endeavor, and did not instruct Price where to move concrete forms on that date. (Horton Aff, at 4-5; Battles Dep., at 106.)

C.    *The Zurich Insurance Policy.*

As mentioned *supra*, the record reflects that Yates was the general contractor at the Caribe Tower site as of December 2004, and that Ceco was a subcontractor responsible for

---

YATES00037, ¶ 6.)

[5]    Indeed, the record reflects than when Ceco required the use of a crane to move a wall form, Ceco employees radioed the crane operator directly, told him where he was needed, and gave him specific directions concerning where the crane's hook should hang. (Battles Dep., at 100-01.)  After Ceco attached a wall form to the crane hook, Ceco would instruct the crane operator to lift the form, move it to the location where it was needed, and then set the wall form down at the proper spot. (*Id.* at 102.)  An example of Ceco's instructions to the crane operator is as follows:  "Typically when they say cable down, they'll say hold, hold the load, hold it where it's at to give the employees time to secure the form prior to unhooking it from the crane." (*Id.* at 102-03.)

concrete form work.  In accordance with the subcontract between them, Ceco agreed to "provide an Owners and Contractors Protective Liability (OCP) policy in the amount of $1,000,000 .... This policy shall name [Yates] as the insured party."  (Zurich Exh. 4, at YATES00032, ¶ 26.)[6] Pursuant to that subcontract, Ceco caused to be issued an Owners and Contractors Protective Liability Policy (the "Policy") by defendant Zurich.  (Battles Dep., at 66; Zurich Exh. 2.)  The Policy named Yates as the named insured and provided for coverage in the amount of $1 million in connection with operations at Caribe Resort Phase 3 for the dates of May 14, 2004 through May 14, 2005.  (Zurich Exh. 3, at YAT000003 - 05.)  Ceco paid the premiums on the Policy, in accordance with its contractual obligations to Yates.  (Battles Dep., at 66-67.)

The Policy on its face provided coverage to Yates for "'bodily injury' ... caused by an 'occurrence' [that] arises out of: (a) Operations performed for [Yates] by [Ceco] at the location specified in the Declarations; or (b) [Yates'] acts or omissions in connection with the general supervision of such operations."  (Zurich Exh. 3, at YAT000010.)  There was, however, a critically important Policy exclusion.  That exclusion was captioned "Acts Or Omissions By You And Your Employees," and provided that the insurance did not apply to bodily injury "arising out of [Yates'], or [Yates'] 'employees', acts or omissions other than general supervision of work performed for [Yates] by [Ceco]."  (*Id.* at YAT000011.)  For ease of reference, that exclusion will be referred to herein as "the Exclusion."

The uncontroverted evidence of record is that Zurich (by and through its agent, Tave Risk Management) delivered the Policy to Ceco on July 29, 2004.  (Zurich Exh. 12.)  However, Zurich never delivered or caused to be delivered a copy of the Policy to the named insured, Yates, prior to the accident.  (Horton Aff., at 5; G. Yates Aff. (Yates Exh. E), at 4.)  George Yates, who was Yates's Senior Project Manager on the Caribe project, averred that had Yates

---

[6]     The parties' summary judgment submissions include various documents, agreements, and correspondence, certain of which have not been authenticated or otherwise submitted in admissible form.  Notwithstanding this omission, no party has objected to the form of these exhibits, with the exception of the witness statements discussed *supra*.  In the absence of objections to the other exhibits, and it appearing that such exhibits can be reduced to admissible form at trial, they will be considered on summary judgment.  *See Rowell*, 433 F.3d at 800 (recognizing that courts on motions for summary judgment may consider any evidence that can be reduced to admissible form).

"had any indication from any source that no coverage was ... provided by Zurich for the risk presented by [Ceco]'s use of the crane and crane operator, [Yates] would have obtained other insurance to provide this coverage." (*Id.*) Zurich maintained no underwriting file for the Policy that might refute Yates' non-delivery assertion. (Yates Exh. J.)[7]

## II. Procedural History.

### A. The State Court Action.

On March 16, 2006, Guerrero (by and through his wife, Maria Guerrero, who had been

---

[7] Although it admittedly has no evidence that the Policy was delivered to Yates, Zurich insists that George Yates' Affidavit on the subject is due to be stricken under the so-called "sham affidavit" rule. "Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003); *see also Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 284 (S.D. Ala. 2006) (explaining and applying "sham affidavit" rule). Zurich contends that George Yates' averments concerning lack of delivery of the Policy are contradicted by his prior deposition testimony; however, this argument cannot withstand scrutiny. The Eleventh Circuit has cautioned that the sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case." *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (citation and internal quotations omitted). For that reason, and to avoid depriving the trier of fact of the opportunity to discern which witnesses are telling the truth, this Circuit "require[s] the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Id.* (citation omitted). Zurich points to no questioning of George Yates in his deposition concerning delivery of the Policy; rather, Zurich hangs its hat solely on an exchange in which counsel asked the witness to explain "what Yates's position is as to why Zurich owes them insurance coverage," in response to which George Yates testified, "I really don't get involved with the insurance end of those type of ..." and "I really can't get into the terms of the policy or anything like that." (G. Yates Dep., at 49-50.) There is no indication that counsel ever inquired of George Yates as to what he meant by these general statements or made any attempt to relate same to policy delivery or scope of coverage issues. Taken in context, the most reasonable reading of this deposition excerpt is simply that George Yates was unfamiliar with the exact legal theory or specific Policy provisions animating Yates's coverage claim. Nothing in that deposition excerpt directly conflicts with the witness's subsequent averments that the Policy was never delivered to Yates and that Yates would have obtained other coverage had it been aware that the Policy did not cover the crane and crane operator supplied to Ceco. There being nothing even remotely rising to the level of an "inherent inconsistency" between the cited deposition excerpt and the affidavit, the Court **overrules** Zurich's objection to George Yates' Affidavit statements concerning the non-delivery of the Policy and the coverage expectations that Yates had. The Affidavit will be considered.

appointed his guardian on grounds of incapacitation) filed a complaint against Price, Yates, and certain fictitious defendants in the Circuit Court of Baldwin County, Alabama (the "*Guerrero* Action").  This complaint alleged a state-law cause of action against Price and Yates for negligence on the grounds that "Price failed to use reasonable care in the operation of the crane thereby causing Martin Guerrero to fall from a concrete form" and to sustain injuries.  (Zurich Exh. 8,  ¶¶ 13-14.)  A parallel claim for wantonness/recklessness was also alleged against Price and Yates, on the premise that the former had "wantonly and/or recklessly operated the crane thereby causing Martin Guerrero to fall from a concrete form."  (*Id.*, ¶ 16.)  Guerrero's complaint repeatedly alleged that on the date in question, "Price was operating a crane in the line and scope of his employment with Yates Construction."  (*Id.*, ¶¶ 13, 16.)

In addition to his claims for negligence and wantonness/recklessness, Guerrero also brought claims against Yates and certain fictitious defendants for negligent failure to maintain the crane, negligent failure to supervise Price's work, and negligent failure to train Price in the use and operation of the crane.  (*Id.*, ¶¶ 18-26.)  Also alleged in the *Guerrero* Action was a loss of consortium claim by Ms. Guerrero based on the alleged failure of Yates and fictitious defendants to use reasonable care to train Price.  (*Id.* at Count Six.)[8]

Declaratory judgment actions concerning an insurer's indemnity obligations are typically not brought until the underlying litigation is concluded.  Nonetheless, there has been no final adjudication of the *Guerrero* Action to date.  To the contrary, Guerrero's claims against Price and Yates remain pending in state court at this time, with the record reflecting that the most recent activity therein was the granting of a motion to continue on October 18, 2007.  (Yates

---

[8]    In summary judgment briefing, Yates has taken the position that any litigation as to coverage for those causes of action is premature because no named parties have been substituted for the fictitious defendants in the underlying lawsuit.  (Doc. 59, at 16.)  From this statement, it is clear that Yates (the plaintiff in these proceedings) does not presently seek a declaratory judgment as to Counts Three, Four, Five and Six of the *Guerrero* Action.  Yates is the master of its complaint.  In light of Yates's concession, those causes of action are plainly outside the scope of these proceedings, and the Court will not consider whether Zurich owes any duty to defend Yates in connection with Counts Three through Six.  The analysis herein is therefore confined to Zurich's coverage obligations with respect to the claims in the *Guerrero* Action seeking to hold Yates vicariously liable for Price's alleged tortious conduct (Counts One and Two).

Exh. I, at 7.)  Thus, at present there has been no finding that Yates or Price is liable to Guerrero and no judgment has been entered against them in the *Guerrero* Action.

Be that as it may, upon receipt of the *Guerrero* Action, Yates made a claim under the Policy for Zurich to furnish it with a defense and indemnity.  On July 26, 2006, Zurich denied coverage based on the Exclusion.  Zurich's denial letter reasoned as follows, "The allegations in the complaint allege direct negligence against Richard Price while he was in the scope [of his] employment for [Yates]. ... [C]laims arising from the acts or omissions of [Yates], other than the supervision of the contractor, are excluded."  (Yates Exh. H, at 3.)  As a result, Zurich has not provided a defense to Yates in the *Guerrero* Action to date.

>    **B.    The Declaratory Judgment Action.**

Notwithstanding the unresolved nature of the *Guerrero* Action, on November 22, 2006, Yates filed its Petition for Declaratory Judgment (doc. 1) in this District Court.[9]  In the Petition, which sounds solely in claims for declaratory judgment, Yates maintains that "the Zurich policy was in full force and effect on December 9, 2004."  (Doc. 1, ¶ 8.)  Yates further asserts that "[t]he clear provisions of the Zurich policy require Zurich to defend and indemnify W.G. Yates against the claims made in the" *Guerrero* Action.  (*Id.*, ¶ 13.)  The relief sought by Yates herein is a declaration that "the claims made against it meet the coverage provisions of the Zurich policy, and that no exclusions or conditions of the policy operate to exclude or void coverage. W.G. Yates further seeks an order that Zurich **immediately undertake its defense and indemnity** in said *Guerrero* bodily-injury suit."  (*Id.*, ¶ 18 (emphasis added).)

At the close of discovery, both parties moved for summary judgment, offering mirror-image positions on the narrow legal questions upon which the coverage determination hinges.[10]

---

[9]    The only named defendant in this action is Zurich.  Yates does not purport to seek a declaratory judgment herein against Ceco, Guerrero, or Ms. Guerrero, and none of them have been joined as parties herein.  Plaintiff's reasons for these glaring omissions of potential party defendants are unclear.

[10]    In briefing their cross-motions for summary judgment, the parties operate under the mistaken impression that their arguments will improve in the retelling.  Rather than articulating their arguments one time, then incorporating them by reference in subsequent briefs, each side reiterates (sometimes verbatim) its arguments in each of three sets of briefs, thereby obliging the Court to wade through numerous redundancies and restatements of the same basic

**III.    Summary Judgment Standard.**

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007); *see also May v. A Parcel of Land*, 458 F. Supp.2d 1324, 1333 (S.D. Ala. 2006) (same). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or

---

legal arguments across multiple briefs. The end result is that the parties collectively submit more than 100 pages of briefing on discrete issues that could have been fully and effectively addressed in a fraction of that bulk. Dueling motions for summary judgment that embrace identical legal issues are not a license to burden the Court by re-arguing the same points *ad infinitum*.

have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts."  *Godard*, 485 F. Supp.2d at 1291; *see also May*, 458 F. Supp.2d at 1333.  Such is the case here.[11]

**IV.    Analysis.**

   **A.    *Plaintiff's Indemnity Claims are Premature.***

   The parties' respective motions for summary judgment seek rulings as to both Zurich's duty to defend Yates in the *Guerrero* Action and its duty to indemnify Yates for any adverse judgment that may be entered against it at some future time in the *Guerrero* Action.  Although the parties have not addressed this issue in their briefs, the indemnification prong of Yates's Complaint is premature on its face.

   Under Alabama law, an insurer's duty to indemnify and its duty to defend the insured are distinct obligations.  *See Tanner v. State Farm Fire & Cas. Co.*, 874 So.2d 1058, 1063 (Ala. 2003) ("Liability insurance coverage includes two separate duties: (1) the duty to defend; and (2) the duty to indemnify.").  Those duties must be analyzed separately for purposes of determining an insurer's obligations to its insured.

   There is abundant support in the case law for the proposition that "an insurer's duty to indemnify is not ripe for adjudication in a declaratory judgment action until the insured is in fact held liable in the underlying suit."  *Assurance Co. of America v. Legendary Home Builders, Inc.*, 305 F. Supp.2d 1266, 1270 (S.D. Ala. 2003) (citations omitted).  Some authorities couch the issue in ripeness terms, while others frame it as a matter of discretion and efficiency, rather than jurisdiction.  *See, e.g., Allstate Ins. Co. v. Employers Liability Assur. Corp.*, 445 F.2d 1278, 1281 (5th Cir. 1971) ("no action for declaratory relief will lie to establish an insurer's liability in a policy clause contest such as the one at bar until a judgment has been rendered against the insured since, until such judgment comes into being, the liabilities are contingent and may never materialize"); *American Fidelity & Cas. Co. v. Pennsylvania Threshermen & Farmers' Mut.*

_____

[11]    Tellingly, the parties' Joint Proposed Pretrial Order (doc. 70) includes a statement by the parties that "[t]he basic facts of this case are not in dispute.  The legal issues are in dispute."  (Doc. 70, at 6.)  The "basic facts" having been agreed upon, as reflected by the parties' joint filing, this action is well suited for resolution via the summary judgment mechanism.

*Cas. Ins. Co.*, 280 F.2d 453, 461 (5th Cir. 1960) (observing in context of declaratory judgment action concerning insurance coverage that "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass," such that district court "was well within its considered judicial discretion to decline to express legal opinions on academic theoreticals which might never come to pass").[12]

In light of the foregoing authorities, the Court is of the opinion that it would be inappropriate at this time to enter a declaration as to Zurich's duty to indemnify Yates in the *Guerrero* Action.  At present, it is purely a matter of speculation and hypothesis as to whether judgment will ever be entered against Yates in those state-court proceedings.  Entry of a ruling now as to whether Zurich is responsible for footing the bill <u>if</u> the *Guerrero* Action culminates in a monetary judgment against Yates would run contrary to fundamental notions of judicial economy, wise judicial administration, and prudent allocation of scarce judicial resources. Accordingly, in the exercise of the Court's sound discretion, Yates' claims for a declaratory judgment on the question of Zurich's duty to indemnify are **dismissed without prejudice**.

 **B.**  ***Legal Contours of Duty to Defend.***

In contrast to the indemnification claims, Yates's request for a declaration concerning

---

   [12]  *See also Nationwide Ins. v. Zavalis*, 52 F.3d 689, 693 (7th Cir. 1995) ("the duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit"); *Employers Mut. Cas. Co. v. All Seasons Window & Door Mfg., Inc.*, 387 F. Supp.2d 1205, 1211-12 (S.D. Ala. 2005) ("It is simply inappropriate to exercise jurisdiction over an action seeking a declaration of the plaintiff's indemnity obligations absent a determination of the insureds' liability to the movants."); *State Farm Fire and Cas. Co. v. Myrick*, 2007 WL 3120262, *2 (M.D. Ala. Oct. 23, 2007) ("Resolving the duty to indemnify before the underlying case is concluded could potentially waste resources of the court because the duty to indemnify could become moot if the insured prevails in the underlying lawsuit."); *Hartford Fire Ins. Co. v. InterDigital Communications Corp.*, 464 F. Supp.2d 375, 378-79 (D. Del. 2006) ("As a general matter, courts refrain from adjudicating whether an insurer has a duty to indemnify the insured until after the insured is found liable for damages in the underlying action"); *Great American Ins. Co. of New York v. Helwig*, 419 F. Supp.2d 1017, 1022 (N.D. Ill. 2006) ("The issue of indemnification would only be ripe for adjudication upon a finding of liability in each of the [underlying] litigations."); *State Farm Fire & Cas. Co. v. Middleton*, 65 F. Supp.2d 1240, 1248 (M.D. Ala. 1999) (insurer's duty to indemnify insured "is not ripe for adjudication until [the insured] is in fact held liable in the underlying state court action").

Zurich's duty to defend it in the *Guerrero* Action is unquestionably a ripe controversy that is properly resolved in this forum via the declaratory judgment mechanism.  The record reflects that Yates made a timely demand for Zurich to furnish it a defense in the *Guerrero* Action, and that Zurich declined.  These circumstances bring the duty to defend question squarely before the Court.  Indeed, "[c]ourts have recognized a controversy exists regarding the duty to defend when the insured seeks a defense from an insurance company, but the insurance company denies that it is obligated."  *State Farm Fire and Cas. Co. v. Myrick*, 2007 WL 3120262, *2 (M.D. Ala. Oct. 23, 2007); *see also American Fidelity*, 280 F.2d at 458 (opining that, unlike the duty to indemnify, "the duty to defend not depend upon the payment to damage claimant or the rendition of a judgment declaring the assured's legal obligation to pay"); *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp.2d 348, 353 (E.D.N.Y. 2006) ("When a determination of the duty to defend can be made and thus clarify the insurer's obligations in the underlying tort action, the DJA is properly invoked.").  Therefore, the Court will consider the parties' respective summary judgment arguments as they relate to the pending, ripe duty to defend issue.

In determining the scope of Zurich's duty to defend, several principles of Alabama law are relevant.  As an initial matter, the Court bears in mind that an "insurer's duty to defend is more extensive than its duty to [indemnify]."  *Tanner*, 874 So.2d at 1063 (citation omitted); *see also Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1011 (Ala. 2005) (explaining that insurer's broad duty to defend arises from principle that ambiguous insurance policies must be construed liberally in insured's favor).  Furthermore, "[w]hether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint."  *Tanner*, 874 So.2d at 1063.  That said, a court is not confined to the allegations of the underlying complaint, but may additionally look to facts which may be proved by admissible evidence.  *Id.* at 1064.  The Alabama Supreme Court has succinctly summarized the applicable legal standard for determining the existence of a duty to defend as follows: "The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between insurer and insured prove a covered accident or occurrence."  *Id.* at 1065.  If both covered claims and non-covered claims are pleaded, then the insurer's duty to defend extends at least to those covered claims.  *Id.*

-13-

**C.     *Estoppel and the Policy Delivery Rule.***

Alabama law generally imposes the burden of proof on policy coverage issues on the insured, while the burden of proving applicability of a policy exclusion rests with the insurer. *Compare Jordan v. National Acc. Ins. Underwriters Inc.*, 922 F.2d 732, 735 (11ᵗʰ Cir. 1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage.") *with Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala. 2001) ("In general, the insurer bears the burden of proving the applicability of any policy exclusion.").[13]   Zurich prudently and correctly concedes in its summary judgment filings that the record is sufficient to satisfy Yates's initial burden of showing that the claims in the *Guerrero* Action fall within the Policy's coverage provisions.[14]   As such, the coverage dispute between Yates and Zurich turns on Zurich's ability to meet its burden of proving the applicability of the Exclusion.  Antecedent to reaching this question, however, Yates insists that Zurich is barred from invoking the Exclusion to deny coverage because Zurich failed to comply with its legal obligation to deliver the Policy to Yates. The Court therefore must examine the threshold issue of whether Zurich is entitled to raise the Exclusion at all.

Under Alabama law, subject to premium payment requirements "every policy shall be

---

[13]     In construing the Policy for purposes of assessing these burdens, the Court adheres to the general proposition that, in the insurance context, "[t]he issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. ... If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court." *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 814 So.2d 877, 879 (Ala.Civ.App. 2001) ("The interpretation of an insurance contract presents a question of law."). "General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract." *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 780 (Ala. 2006).

[14]     Based on the allegations of the *Guerrero* complaint and other available evidence, Zurich admits that "it does appear that the requirements of the Policy's insuring agreement have been met with respect to the duty to defend." (Doc. 40, at 8.)  In that regard, Zurich points to allegations and evidence that (a) Guerrero sustained bodily injury as that term is defined in the Policy; (b) the injury occurred while Guerrero was working on a Ceco crew; (c) the Ceco crew was performing work that Ceco had agreed to perform for Yates; and (d) the work was being performed at the insured location (*i.e.*, the Caribe job site).  The Court concurs with Zurich's assessment that "these allegations appear to satisfy Yates' initial burden for proving coverage." (Doc. 40, at 8-9.)

mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance." Ala. Code § 27-14-19(a).  Alabama courts have stringently enforced this requirement, and under certain circumstances have imposed draconian penalties on insurers who fail to comply.  In fact, the Alabama Supreme Court has held that "when an insurer fails to deliver a copy of the policy to an insured in accordance with Ala. Code 1975, § 27-14-19, **the insurer may be estopped from asserting an otherwise valid exclusion.**"  *Brown Machine Works & Supply Co. v. Insurance Co. of North America*, 659 So.2d 51, 60 (Ala. 1995) (emphasis added).  But the *Brown Machine Works* holding has an important caveat, authorizing such estoppel only where the violation of § 27-14-19 "has prejudiced the insured."  *Id.* at 58; *see also Southern Foodservice Management, Inc. v. American Fidelity Assur. Co.*, 850 So.2d 316, 320 (Ala. 2002) (citing *Brown Machine Works* for this proposition).[15]

The uncontroverted evidence in the summary judgment record is that Zurich never delivered a copy of the Policy to Yates prior to Guerrero's accident, which occurred approximately seven months after the effective date of coverage.  Indeed, two Yates representatives (George Yates and John Horton) unambiguously state that Zurich neither delivered the Policy to Yates nor caused such Policy to be delivered to Yates within a reasonable time.  Zurich has no evidence to the contrary, as it acknowledges that it does not even possess an underwriting file for the Policy.

Nonetheless, Zurich advances a phalanx of mostly meritless arguments for why the estoppel principles of *Brown Machine Works* should not apply here.  Zurich protests that Yates is barred from relying on § 27-14-19 because Yates's Complaint contains an admission that the Policy "was in full force and effect" on the date of Guerrero's accident.  This reasoning is opaque.  Whether a policy of insurance is in full force and effect is an entirely different question from whether the insurer has complied with the delivery requirements of § 27-14-19.  That statute neither expressly nor impliedly provides that an insurance policy is ineffective if it has

---

[15]   This limitation is central to the holding of *Brown Machine Works*, wherein the court explained as follows: "We hold that § 27-14-19 requires that the insurance policy be 'mailed or delivered' to the purchaser of a policy and to the named insured, and that an insurer may be estopped from asserting conditions of, or exclusions from, coverage where such a purchaser or insured is prejudiced by the insurer's failure to comply with the statute." *Id.* at 61.

not been delivered; rather, such an omission merely forecloses the insurer from relying on an exclusion to avoid coverage if prejudice to the insured would result.  The Court perceives no inconsistency between Yates's allegation in the Complaint that the Policy was in full force and effect, on the one hand, and Yates's contention that Zurich should be estopped by operation of § 27-14-19 from relying on exclusions because the Policy was not timely delivered.  As Zurich has offered neither legal authority nor persuasive argument in support of its position, this objection is overruled.

Next, Zurich balks that it actually did satisfy the statutory requirement by timely delivering the Policy to Ceco, the entity that ordered and paid premiums on the Policy.[16] According to Zurich, the statutory requirement "is stated in an 'either/or' fashion and is met by delivery to 'the insured or to the person entitled thereto.'" (Doc. 58, at 19 (quoting § 27-14-19).) Under Zurich's construction, then, § 27-14-19 allows an insurer to pick and choose among all the persons or entities who might be entitled to delivery of the Policy, and its delivery obligation is discharged in full so long as it furnishes the Policy to a single such entity or person.  In addition to being absurd on its face,[17] this construction of the statute is precluded by *Brown Machine Works*, which explains that, while § 27-14-19 is not so broad as to extend a right to delivery to all potential claimants under an insurance policy, the purchaser of the policy and the named insured "are definitely included" and are individually entitled to receive copies of the policy.  659 So.2d at 60.  The *Brown Machine Works* holding is quite clear that the statute

---

[16]     A corollary to this argument is Zurich's attempt to shift responsibility to Ceco for delivering the Policy to Yates because the subcontract obligated Ceco to "provide" the Policy to Yates.  Nothing in the statute would allow an insurer to shirk its duty to deliver a policy to the named insured simply because some other person or entity owed a contractual duty to give a copy of the policy to that insured.  As such, whether Ceco was in breach of the subcontract by virtue of its failure to forward a copy of the Policy to Yates is of no consequence to the question of Zurich's compliance with § 27-14-19.

[17]     If § 27-14-19 is designed to protect purchasers and named insureds from being ambushed by policy exclusions or conditions of which the insurer had never notified them, that objective would be defeated if the insurer could decide in its sole discretion to give notice to a purchaser but not a named insured, or to one named insured but not another named insured. Such an obviously inadequate outcome would subvert the whole purpose of the statutory delivery requirement.

requires delivery "to the purchaser of a policy *and* to the named insured." *Id.* at 61 (emphasis added).  As such, Zurich's contention that it complied with the delivery requirement by furnishing the Policy to the purchaser, without providing a copy to the named insured, is incorrect as a matter of law.[18]

There is no question, then, that Zurich was obligated under Alabama law to furnish a copy of the Policy to Yates within a reasonable period of time, and that it failed to satisfy that obligation.  The critical question becomes whether Yates was prejudiced by this omission, so as to estop Zurich from invoking the Exclusion to deny coverage.  *See, e.g., Akpan v. Farmers Ins. Exchange, Inc.*, 961 So.2d 865, 871 (Ala.Civ.App. 2007) (stating that insurer who fails to comply with § 27-14-19's delivery requirement "can be estopped from asserting conditions and exclusions appearing in the policy *when the insured is prejudiced* by the insurance company's noncompliance").  After careful consideration of the record and the arguments of counsel, the Court concludes that Yates has failed to demonstrate the requisite prejudice.  Yates does not profess to have been shocked by the Exclusion's existence, or to have been in any way caught unawares that the Policy did not cover bodily injury arising from Yates's employees' acts or omissions.[19]  Instead, Yates's sole evidence of prejudice is a haltingly worded Affidavit from George Yates that if the company had "had any indication from any source that no coverage was ... provided by Zurich for the risk presented by Ceco Concrete's use of the crane and crane

―――――――――――――――

[18]     Equally unavailing are Zurich's unsupported protestations that Yates failed to give notice to Zurich of the non-delivery issue "between the time of George Yates' deposition and Yates' filing of its Motion for Summary Judgment."  (Doc. 58, at 18-19.)  Zurich neither sets forth any legal principles that would require such notice nor cites any authority in support of such a proposition.  It is not this Court's responsibility to develop a litigant's arguments for it.

[19]     Any such assertion of surprise would be patently incredible.  After all, the policy of insurance that Ceco was contractually obligated to provide for Yates was an Owners and Contractors Protective Liability ("OCP") policy.  OCP policies routinely are confined to vicarious liability, and do not extend coverage to the named insured for the named insured's own acts or omissions except in its role of generally supervising the subcontractor.  *See generally* T. Galganski, "Owners and Contractors Protective Liability: An Insurance Tool in Construction," 15-JAN *Construction Lawyer* 8, 8-9 (Jan. 1995).  All indications are that the Exclusion in this case is a standard feature of OCP policies, hardly the sort of clause as to which a sophisticated insured like Yates could legitimately claim ignorance or surprise.

-17-

operator, W.G. Yates would have obtained other insurance to provide this coverage. ... Not until after this accident did W.G. Yates have any knowledge that Zurich would claim its policy did not cover W.G. Yates for the use of the crane and crane operator ....” (G. Yates Aff., at 4-5.) But Yates makes no showing whatsoever that review of the Policy would have provided such an “indication” to it.[20] Yates does not suggest that it did not anticipate the Exclusion being contained in the Policy, only that it did not know Zurich would argue that Price's crane operations fell within the Exclusion. That carefully circumscribed statement does not go nearly far enough to satisfy Yates's obligation to establish prejudice.[21]

---

[20]     To the contrary, it seems highly likely that prior to the Guerrero accident, Yates would have read the Exclusion in precisely the same way that it does now, namely, as failing to reach Price's crane operation activities for Ceco. Stated differently, the cornerstone of Yates's position in this lawsuit is that Price's activities were covered under the Policy and were outside the scope of the Exclusion. Given how emphatically Yates has taken that position, it would be disingenuous for Yates to argue that if it had only known about the Exclusion beforehand it would have procured additional insurance so there would be coverage for Price's crane operation activities. It is perhaps out of desire to avoid such an inconsistency that Yates treads so lightly here. Instead of affirmatively representing that it would have obtained more coverage if it had known about the Exclusion, Yates merely says that it would have obtained more coverage if it had known how Zurich would interpret the Exclusion. But the mere delivery of the Policy would not have placed Yates on notice of Zurich's interpretation of that Exclusion; therefore, Yates's proof of prejudice falls well short of the mark.

[21]     The kind of prejudice showing required by Alabama courts in the § 27-14-19 estoppel context is demonstrated by *Ex parte Clarke*, 728 So.2d 135 (Ala. 1998), which involved an automobile insurance policy endorsement (added several years after the policy was issued) that allowed the insurer to require an insured making a claim to submit to examination under oath. After the *Clarke* insureds made a claim, the insurer requested they appear for examination under oath, and denied coverage when they failed to do so, citing the endorsement. The insureds objected that the insurer had never previously sent the endorsement to them, nor otherwise notified them of its existence. If the insureds' position were correct, “the prejudice to the insureds from the failure of the insurance company to deliver the endorsement was plain: they did not learn of their duty to submit to examinations under oath until after the insurance company denied their claim.” *Akpan*, 961 So.2d at 872 (discussing *Clarke*). Therefore, *Clarke* concluded that fact questions as to whether the endorsement was delivered pursuant to § 27-14-19 precluded entry of summary judgment for the insurer based on that endorsement. By contrast, Yates has come forward with no evidence that it was unaware of the Exclusion prior to the Guerrero accident, only that it was unaware that Zurich would construe that Exclusion in such a manner. Nothing in § 27-14-19 obligates an insurer to inform the insured of its interpretations of each and every policy provision and exclusion contemporaneously with

Because Yates has failed to demonstrate any prejudice arising from Zurich's noncompliance with the requirements of Ala. Code § 27-14-19, Yates's request that Zurich be estopped from relying on the Exclusion in this coverage dispute is **denied**. The Court now turns to the parties' respective arguments as to application of the Exclusion to the facts of this case.

### D.    *The Exclusion.*

After all of the ancillary issues are stripped away, only a single discrete question remains. The applicable insurance policy excludes coverage for bodily injury arising out of the acts or omissions of Yates or its employees, except for Yates's general supervision of Ceco's work.[22] If Zurich can prove that Price's crane operation activities on December 9, 2004 fall within the Exclusion, then no duty to defend attaches and Zurich need not furnish a defense to Yates in the *Guerrero* Action.[23] If, however, Zurich fails to meet its burden of proof as to the applicability of

---

delivery, so Yates cannot demonstrate the requisite prejudice here.

[22]    Although Yates tenders a half-hearted argument that the "general supervision" exception to the Exclusion applies here, such an assertion is wholly unsupported by the record. There is not a shred of evidence that the underlying claims seek to impose liability for Yates's acts or omissions in generally supervising Ceco's work at the Caribe job site. Rather, the theory of liability posited against Yates in the relevant causes of action in the *Guerrero* Action (*i.e.*, the claims that are the subject of this declaratory judgment action, not the claims that Yates has conceded are beyond the scope of this litigation) is that Yates is liable in respondeat superior for the negligent or wanton operation of the crane by its employee, Price. Yates is not being sued for any acts or omissions in generally supervising Ceco's work, and the undisputed evidence is that Yates was not supervising or directing Ceco's concrete formation activities at the moment of the accident. As such, and notwithstanding Yates's unpersuasive contentions to the contrary, the "general supervision" exception to the Exclusion is clearly inapplicable.

[23]    In evaluating whether Zurich can show the applicability of the Exclusion to the circumstances of this case, the Court recognizes that Alabama law requires policy exclusions to be interpreted as narrowly as possible, so as to maximize coverage, and must be construed against the insurer that drafted and issued the policy. *See Generali US Branch v. The Boyd School, Inc.*, 887 So.2d 212, 216 (Ala. 2004) ("Exceptions to coverage in a policy of insurance must be interpreted as narrowly as possible in order to provide maximum coverage of the insured.") (citation omitted); *Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 806 (Ala. 2002).

the Exclusion, then Zurich must defend Yates in the *Guerrero* Action.[24]  This inquiry hinges on whether Price is properly classified as a Yates employee at the time of the accident.

It is alleged in the *Guerrero* Action that Price's negligent, wanton or reckless operation of the crane caused Guerrero's injuries.  To meet its burden as to the Exclusion, Zurich relies on a wealth of undisputed evidence that Price was generally a Yates employee who was hired by Yates, was on the Yates payroll, was assigned by Yates to work the crane on the date of the accident, and was subject to discipline and discharge exclusively by Yates.  According to Zurich, this uncontroverted evidence confirms that Guerrero's claims concern bodily injury arising from the acts or omissions of a Yates employee (*i.e.*, Price), such that the Exclusion clearly bars coverage and relieves it of any duty to furnish Yates with a defense.  Yates counters that Alabama's borrowed servant doctrine renders Price a Ceco employee at the time of the accident because Ceco was directing and controlling his work, thereby negating the Exclusion.  At their core, then, the cross-motions for summary judgment turn on the application of the borrowed servant doctrine to the largely undisputed record facts.

>    1.    The Borrowed Servant Doctrine.

"Under Alabama law, the borrowed servant doctrine recognizes that an employee may be in the general service of and paid by his employer [Yates] and nevertheless be transferred for a particular work assignment to a third-party employer [Ceco]."  *Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1344 (11th Cir. 2007); *see also Ware v. Timmons*, 954 So.2d 545, 551 n.7 (Ala. 2006) (recognizing "elementary" rule that when one employer "puts his servant at the disposal of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter *and not of the former*") (citation omitted).  "The ultimate test in determining whether an employee has become

---

[24]      As discussed *supra*, the duty to defend is absent only where "neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between insurer and insured prove a covered accident or occurrence."  *Tanner*, 874 So.2d at 1065.  The *Guerrero* Complaint does not allege a covered accident (inasmuch as it contends that Price was a Yates employee acting in the line and scope of his employment for Yates at the time of the accident); therefore, the existence or nonexistence of the duty to defend turns on whether evidence developed in this case proves a covered accident (*i.e.*, that Price should actually be deemed a Ceco employee).

a loaned servant is a determination of whose work the employee was doing and under whose control he was doing it." *Proctor*, 494 F.3d at 1344 (quoting *United States Fidelity & Guar. Co. v. Russo Corp.*, 628 So.2d 486, 489 (Ala. 1993)); *see also Hauseman v. University of Alabama Health Services Foundation*, 793 So.2d 730, 736 (Ala. 2000) ("In determining whether an employee has become a loaned servant the ultimate test is: Whose work was the employee doing and under whose control was he doing it?") (citation omitted).  In making the "control" determination, Alabama courts stress that "[i]t is not the actual exercise of control which is determinative but rather the reserved right to control the employee." *Hauseman*, 793 So.2d at 736 (citation omitted); *see also Russo*, 628 So.2d at 489 (reserved right of control, not actual exercise of control, is true test of relationship, inasmuch as responsibility is determined by power to control).

        "Whether one who is usually and normally the servant of one master has become specially and temporarily the servant of another ... is ordinarily a question of fact." *Hauseman*, 793 So.2d at 736 (citation omitted); *see generally Proctor*, 494 F.3d at 1355 ("The Alabama Supreme Court has repeatedly held that vicarious liability stemming from master-servant relationships is usually a question of fact for the jury.").  That said, application of the borrowed servant doctrine does not always present a jury question.  "If, under the circumstances only one inference can be properly drawn, the court will determine the issue, but, if reasonable men may fairly come to different conclusions respecting the inference to be drawn from the facts, the case will be one for the jury." *Russo*, 628 So.2d at 488-49 (citation omitted).

        "[T]he borrowed servant doctrine is an affirmative defense for which the defendant bears the burden of pleading and proof." *Proctor*, 494 F.3d at 1350.  Because Yates invokes the doctrine in this case, it is Yates who bears the burden of establishing its application to these facts.

                2.        *Application of Borrowed Servant Doctrine to Record Facts.*

        The centerpiece of the borrowed servant analysis in this case is the 1993 decision of *United States Fidelity & Guar. Co. v. Russo Corp.*, 628 So.2d 486 (Ala. 1993), which is strikingly similar to the case at bar.  In *Russo*, a general contractor hired a subcontractor for a construction project.  The subcontractor employed a crane operator (McLelland) to perform those tasks.  When the subcontractor's work was completed, the subcontractor authorized

McLelland to continue performing crane operation services for the general contractor. McLelland remained on the subcontractor's payroll at all times, and the subcontractor retained the right to fire him, to remove him from the job site, or to alter his assignment at any time. Thereafter, an accident occurred when McLelland left the crane unattended, prompting the general contractor to sue both McLelland and the subcontractor. The subcontractor raised the borrowed servant doctrine as an affirmative defense. The Alabama Supreme Court held that the subcontractor was entitled to summary judgment on that defense, reasoning as follows:

> "[I]f [the general contractor] had had employees with the ability to operate the crane, it would not have had to secure the services of McLelland from [the subcontractor]. In securing McLelland's services, [the general contractor] *assumed control of McLelland and directed him to perform certain acts with the crane. Therefore, [the general contractor] was, for the time being, in complete charge of McLelland*. Furthermore, McLelland was transferred to [the general contractor] with his own consent and with [the subcontractor's] consent, and he became [the general contractor's] servant with all the legal consequences of the new relation. ... The fact that McLelland was paid by [the subcontractor] does not, under the circumstances in question, prevent his being an employee of [the general contractor] in performing the particular task involved. ...

> "Based on the foregoing, we conclude that, because only one inference could be properly drawn from the evidence, the trial court properly entered a judgment for [the subcontractor]."

*Russo*, 628 So.2d at 489 (emphasis added).

This case follows a closely analogous factual trajectory to *Russo*. Had Ceco had its own employees who could operate a crane at the Caribe site, it would not have had to include in the subcontract a provision that Yates provide a crane operator. Additionally, Zurich does not and cannot dispute that once Price was assigned to the crane, Ceco assumed control of him and directed him to perform specific acts with the crane, such that Ceco was in complete charge of Price during the times when he was actually operating the crane. The record adequately demonstrates that both Yates and Price consented to this arrangement, and there is no contrary evidence. Therefore, under the holding of *Russo*, the only permissible inference from these facts is that Price became Ceco's servant with all the legal consequences of that relationship.

Notwithstanding the obvious dispositive similarities between this case and *Russo*, Zurich maintains that "there are also important factual differences" and that consideration of "some key

facts" would flip the outcome 180 degrees.  (Doc. 58, at 13-14.)  First, Zurich points out that Price was in the general employ of Yates, who hired him, paid him, assigned him to the job site, suspended and ultimately fired him.  (*Id.* at 14.)  But this is a false distinction, because such facts were equally true of McLelland in *Russo*.  Second, Zurich argues that, while the general contractor reimbursed the subcontractor in *Russo* for its use of McLelland, no such reimbursement occurred here.  (*Id.* at 14.)  But this distinction is not material because (a) *Russo* found that the identity of the party paying McLelland did not change the result, and (b) under Alabama law, the source of payment for the employee is relevant only insofar as the evidence does not clearly establish who has the power to control the employee at the time of the accident, and such power of control is clearly established here.[25]  Third, Zurich cites record facts that Yates had furnished crane operators to other subcontractors.  (*Id.* at 14.)  That may or may not be true, but Zurich proffers neither authority nor argument for why or how a loan of crane operators to other subcontractors bears on whether Price was a loaned servant on December 9, 2004.[26] Fourth, Zurich would distinguish *Russo* by stating that Ceco had no right to fire Price, could not tell Price what time to arrive at or depart from the job site, and could not direct Yates to furnish a particular crane operator.  (*Id.* at 14 (citing Battles Dep., at 127).)  Again, the proposed distinction rings hollow.  The "borrowing" employer in *Russo* did not have the right to hire or fire McLelland, and the lending employer in *Russo* retained the right to assign McLelland

---

[25]     As to the latter point, the Alabama Supreme Court has cautioned that courts must consider factors such as who is paying the employee, but that such factors "are merely aids in determining the relation and do not necessarily determine the relationship.  They are to be applied only in those cases where the evidence does not clearly establish who is the employer. The true criterion is the exercise of power to control the employee at the time of the commission of the act."  *Russo*, 628 So.2d at 488 (citation omitted).  Here the evidence does clearly establish who exercised the power to control Price at the time of Guerrero's injury; therefore, the factor of which entity paid Price is not properly applied.

[26]     Furthermore, the sole record evidence cited by Zurich for this proposition is a paragraph from the Ceco/Yates subcontract which states that Yates must provide a crane operator for Ceco's use, and that "[p]riority consideration shall be given to Ceco's forming operations."  (Zurich Exh. 4, at YATES00037, ¶ C.6.)  That generic language does not show or even suggest that Yates actually provided crane operators to other subcontractors; therefore, the factual predicate of Zurich's argument is devoid of cited record support.

anywhere it wished.  Thus, Zurich has failed to identify any material difference in the circumstances presented here and those in *Russo*.

         *3.*      *Arguments that the Borrowed Servant Doctrine is Inapplicable.*

Aside from its unsuccessful efforts to distinguish *Russo*, Zurich proffers several other justifications for its position that the borrowed servant doctrine does not apply here.  Zurich argues that Yates's own stipulation during discovery that Price was employed by Yates on the date of the accident is binding, and forecloses borrowed servant status for Price.  (Doc. 40, at 10; doc. 62, at 2.)  The Court disagrees.  That stipulation took the form of an oral statement by Yates's counsel during a deposition that Price was initially employed by Yates, was listed on Yates's payroll, and "was a Yates employee on the date of this incident."  (G. Yates Dep., at 19.) According to Zurich, the quoted portion of the stipulation is exact and therefore binding on Yates.  But under no fair reading of that stipulation was Yates waiving the right to rely on the borrowed servant doctrine.  Zurich does not allege that it was deceived or misled into believing that Yates did not intend to argue that Price was a loaned servant for purposes of this coverage dispute.  Rather, from the context, it is quite clear that all parties fully understood that Yates's counsel was simply conceding that Price was generally or nominally employed by Yates on the date in question, without in any way foreclosing the argument that Price had effectively been transferred to Ceco that day by operation of the loaned servant doctrine.  While plaintiff's counsel undoubtedly could have chosen her words more carefully in articulating the stipulation, the Court will not allow defendant to exploit what was at most a harmless slip of the tongue to construe those words in a manner that is unfair, unjust, and contrary to their obvious intent.

Next, Zurich cites *Ware v. Timmons*, 954 So.2d 545 (Ala. 2006), for the proposition that employer-employee relationships require both a reserved right of control and a right of selection. Because there is no evidence that Ceco had a right to select Price, Zurich reasons, he could not be classified as Ceco's employee as a matter of law.  (Doc. 40, at 10.)  It is correct that *Ware* announces the principle that "an alleged employer not only must possess a right of control, but also must have voluntarily entered into the relationship, that is, had the right to choose – to select and to dismiss – the alleged servant; otherwise, there is no master-servant relationship."  *Ware*, 954 So.2d at 553.  However, the Court rejects Zurich's assertion that this principle has application here.  To apply *Ware* as Zurich does would effectively overrule decades of Alabama

-24-

precedents concerning the borrowed servant doctrine, including notably *Russo*, wherein the Alabama Supreme Court deemed an employee to have been borrowed by an entity that had no right to hire or fire him.  *Ware* cannot reasonably be read as cutting such a broad swath through Alabama's loaned servant jurisprudence; to the contrary, the *Ware* majority took great pains to explain that its ruling was not premised on the loaned servant doctrine and that its analysis did not reach that doctrine.  *See Ware*, 954 So.2d at 551 n.7.  On its face, then, *Ware* says nothing about the criteria for or application of the borrowed servant doctrine to a particular fact scenario, and certainly does not fashion a new "right to select" prerequisite to Alabama's well-established case law shaping and refining that doctrine.  Surely if the Alabama Supreme Court had intended in *Ware* to effect such massive upheaval of its borrowed servant jurisprudence, it would not have so emphatically distanced its ruling from that doctrine.[27]  The Court therefore declines to engraft a "right to select" mandatory condition onto Alabama's loaned servant doctrine for purposes of assessing Price's eligibility for same.

As its next counterargument, Zurich argues that Price could not possibly have been a loaned servant to Ceco because the "hoisting" work that he performed falls outside Ceco's scope of work as delineated in the Yates/Ceco subcontract.  (Doc. 40, at 4; doc. 62, at 3-4.)  If Ceco was not responsible for hoisting, Zurich reasons, Price could not have been performing Ceco's work at the time of the accident and therefore could not qualify as a loaned servant under the

---

[27]     In arguing otherwise, Zurich takes the position that "the loaned servant doctrine ... is subsumed by the tests laid out in the *Ware* decision."  (Doc. 62, at 4.)  The *Ware* majority certainly did not seem to think so.  In disavowing any use of a loaned servant analysis, the *Ware* majority was responding to the dissent's vehement objection that Alabama courts had never before suggested that the "right to select" was part of the loaned servant analysis.  *Compare Ware*, 954 So.2d at 569 (Harwood, J., dissenting) (asserting that the majority's determination effectively demanded that the trial court "should ignore the various statements this Court has offered over the decades of 'the ultimate test' for determining a loaned-servant relationship, none of which has ever suggested that the 'right to select' is a required component of the analysis") *with id.* at 551 n.7 (majority opinion) ("Notwithstanding the extensive argument in the dissent about our treatment in this opinion of the loaned-servant doctrine, we do not premise our decision on that doctrine.").  Thus, a careful reading of *Ware* makes plain that the majority neither applied nor amended the loaned servant doctrine in any respect, much less cobbled onto it a brand new "right to select" requirement.  Yet Zurich would have this Court conclude that the *Ware* decision was doing precisely that which the *Ware* majority asserted it was not doing.  The Court cannot endorse such reasoning.

"ultimate test" of whose work the employee was performing and under whose control he was doing it, because he was performing Yates's work, not Ceco's. It is true that the subcontract excluded from Ceco's scope of work "[h]oisting, trash haul-off, sanitary facilities, temporary lighting, drinking water, or electrical power." (Zurich Exh. 4, at YATES00036, ¶ B.9.) It is also true that the crane was described as a "hoist" in the subcontract. (*Id.* at YATES00037, ¶ C.6.) Nonetheless, Zurich's argument fails because it reads the subcontract too narrowly, focusing on one provision to distort the meaning of the document as a whole. Notwithstanding the statement in the subcontract that Ceco would not be responsible for hoisting work, the subcontract clearly provides that Ceco's scope of work includes Yates providing Ceco with "use of hoists including operator at all times ... for unloading, hoisting, positioning and loading Ceco's forming materials." (*Id.*) Harmonizing the two provisions, the subcontract plainly provides that Yates was to provide a crane and crane operator for Ceco to use in performing Ceco's concrete forming operations at the Caribe site. Ceco's use of that crane and crane operator, once provided by Yates, for its concrete forming operations would obviously be within the scope of Ceco's work. Furthermore, the unrebutted testimony of Ceco's representative was that "use by Ceco of the crane and crane operator [was] for work within the scope – within Ceco's scope of work.." (Battles Dep., at 99.)[28]

Finally, Zurich contends that finding Price to be a loaned servant would run counter to "other decisions from courts of the 11th Circuit." (Doc. 62, at 5.) In this regard, Zurich relies on

---

[28] More generally, Zurich's argument that crane operations were not part of Ceco's work cannot withstand common-sense examination. The overwhelming evidence in the record is that Ceco required the use of a crane and crane operator to lift and move concrete wall forms in performing Ceco's duties on the Caribe project. Without a crane and crane operator, Ceco would be unable to do its job. There is equally overwhelming evidence that once assigned a crane and crane operator, Ceco and Ceco alone told that crane operator what to do, which wall forms to lift, when to lift them, where to move them, and when and where to set them down. It is undisputed that Yates had nothing to do with hoisting other than to provide the crane and crane operator, who were placed under Ceco's complete and exclusive control for the duration of all hoisting activities performed on a particular day/shift. For Zurich to suggest that the crane operator's efforts in this regard were somehow beyond the boundaries of Ceco's work simply because the subcontract states that Ceco is not responsible for hoisting is to ignore these undisputed facts and to obfuscate the uncontroverted reality of how Ceco went about performing its work on the job site.

an unpublished decision emanating from the Northern District of Florida, *Greathouse v. Ceco Concrete Const., LLC*, 2007 WL 624550 (N.D. Fla. Feb. 23, 2007).  Zurich admits that "the issues involved in *Greathouse* do not match up with the issues in the subject case," but asserts that *Greathouse* nonetheless "does provide some persuasive guidance for this Court."  (Doc. 62, at 5.)  But perusal of *Greathouse* does not shed any light on the issues pending in this case.  *Greathouse* includes no discussion of the loaned servant doctrine.  Even if it did, *Greathouse* was decided under Florida law, not Alabama law.  As such, *Greathouse* is not helpful in determining the proper application of Alabama's loaned servant doctrine to the undisputed facts contained in the summary judgment record in this case.[29]

> 4.      *Summary of Borrowed Servant Findings.*

With respect to the loaned servant doctrine, "[t]he true criterion is the exercise of power to control the employee at the time of the commission of the act."  *Russo*, 628 So.2d at 488 (citation omitted).  The record unambiguously reflects that at the time of the events giving rise to the *Guerrero* Action, Price was acting under the exclusive and complete control of Ceco.  At the moment of Guerrero's injury, it was Ceco who controlled and directed Price's operation of the crane in furtherance of Ceco's work on the construction project.  Yates had no say whatsoever in Price's activities at that instant.  Thus, at the relevant time, Price was performing Ceco's work under Ceco's control.  That Yates paid Price and possessed the sole power to terminate his employment in no way alters the analysis.  Furthermore, the Court is of the opinion that, as in *Russo*, only one inference can be properly drawn from the summary judgment record on the question of whether Price had specially and temporarily become the servant of Ceco at the time of the accident.  Therefore, the Court finds as a matter of law that, by operation of the loaned servant doctrine, Price was properly classified as the servant of Ceco and not of Yates when he engaged in the alleged acts and omissions that are the subject of the *Guerrero* Action.  Because

---

[29]      It appears that Zurich's principal purpose in submitting *Greathouse* was to show that Ceco elected not to invoke the loaned servant doctrine in another action pending in Florida.  Such an omission on Ceco's part in another action proves neither that Ceco could not have invoked the loaned servant doctrine in *Greathouse* nor that Yates is improperly relying on that doctrine here.  More generally, nothing in *Greathouse* demonstrates or militates in favor of a determination that Alabama's loaned servant doctrine is unavailable here.

Price is properly deemed to have been transferred to Ceco's employ at the relevant time, Zurich's policy exclusion for acts or omissions of Yates or Yates's employees is inapplicable. No other exclusions or defenses to coverage having been raised, the Court concludes that Zurich is legally obligated to furnish a defense to Yates in the *Guerrero* Action.

**V.    Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.    Plaintiff's Motion to Strike (doc. 61) is **denied**;

2.    Plaintiff's claims for declaratory judgment on the question of defendant's duty to indemnify it in the underlying action are **dismissed without prejudice** as premature;

3.    Defendant's Motion for Summary Judgment (doc. 39) is **denied**;

4.    Plaintiff's Motion for Summary Judgment (doc. 51) is **granted** with respect to the duty to defend claim; and

5.    It is hereby **declared** that defendant Zurich American Insurance Company owes a duty to defend plaintiff W.G. Yates & Sons Construction Company in that certain litigation captioned *Martin Guerrero, et al. v. Richard Price, et al.*, and pending in the Circuit Court of Baldwin County, Alabama, as Case No. CV-06-255.  It is further **declared** that defendant is obligated to reimburse plaintiff the reasonable costs (including attorney's fees) necessarily incurred by plaintiff in defending that state court litigation to date.[30]

---

[30]    There is some indication in the Joint Proposed Pretrial Order that Yates intends to move this Court to award damages by making a determination as to the total amount of fees and costs incurred in defending the *Guerrero* Action for which Zurich is liable to reimburse Yates. Under Alabama law, "[a]ttorney's fees incurred as a proximate result of ... [a] refusal to defend the suit are appropriate damages for breach of contract."  *Green v. Standard Fire Ins. Co. of Alabama*, 477 So.2d 333, 335 (Ala. 1985).  But there is no breach of contract cause of action pending here.  Indeed, neither the Complaint nor the joint pretrial document purports to set forth claims for breach of contract or identifies any sort of award of defense costs in the underlying suit as a triable issue that has been joined in these proceedings.  Yates petitioned the Court to enter a declaration as to Zurich's duty to defend in the *Guerrero* Action, and the Court has now done just that.  Therefore, no further issues remain pending for resolution herein, and this file is properly closed at this time.

DONE and ORDERED this 8th day of January, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE